IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| ARMANDO M. GARCIA, | § | |
| | § | |
| Plaintiff | § | |
| | § | Civil No. 2:15-cv-70 |
| -v- | § | |
| | § | |
| CHARLES MENDEKE, in his Individual | § | |
| and Official Capacity, and UVALDE | § | |
| COUNTY, TEXAS. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

NOW COMES Plaintiff Armando Garcia and files Plaintiff's Original Complaint.

## I
## SUMMARY

Uvalde County Sheriff Charles Mendeke fired Armando Garcia because he provided evidence to the F.B.I. and the District Attorney that current Uvalde County Deputy Max Dorflinger did drugs, stole drugs, and tampered with evidence. Sheriff Mendeke's actions violate state and federal law.

## II
## PARTIES

1.   Plaintiff Armando Garcia is an individual who resides in Uvalde County, Texas.   At all times relevant to this complaint, Mr. Garcia was an employee of the Uvalde County Sheriff's Department.

2.   Defendant Charles Mendeke is an individual who resides in Uvalde County, Texas.  At all times relevant to this complaint, Mendeke was the Sheriff of Uvalde County, Texas.   Mendeke may be served at 339 King Fisher Lane, Uvalde County, Texas 78801.

3.   Defendant Uvalde County is a local governmental entity that may served with process by serving the County Judge William Mitchell at 100 North Getty, Street, Courthouse Plaza, Uvalde Texas 78801.

## III
## JURISDICTION AND VENUE

4.   This Court has original jurisdiction to hear this complaint under 28 U.S.C. § 1331, this action being brought under 42 U.S.C. § 1983.

5.   This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, these claims being so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

6.   Venue is appropriate because the acts giving rise to this lawsuit occurred within Uvalde County, Texas, which is within the Del Rio Division of the Western District of Texas.

IV
FACTS

7.   Armando Garcia began working for the Uvalde County Sheriff's Department on January 1, 2009.  At the end of his employment Mr. Garcia's position was Sgt. Investigator.

8.   During his employment, Mr. Garcia's assignments included, Investigator and Supervisor, Evidence Custodian, Internal Affairs and work with The Federal Bureau of Investigation out of the Del Rio, Texas Office.

9.   Sheriff Charles Mendeke assigned Mr. Garcia to work with F.B.I. because he had an existing working relationship with them because of other cases.

10.  With the F.B.I, Mr. Garcia was assigned to work on major organized gangs and police corruption.

11.  On August 22, 2014, Mr. Garcia met with a citizen who told him that one of the deputy sheriffs was snorting cocaine with gang members inside the restroom of a local bar in Uvalde.  After being shown pictures of sheriff's department employees, the citizen identified the sheriff's deputy as Max Dorflinger.

12.  It is against federal and state law for a sheriff's deputy to snort cocaine.

13.  Mr. Garcia reported this information to the F.B.I. and Sheriff Mendeke.

14.  On or about August 25, 2014, Mr. Garcia informed Sheriff Mendeke that he would begin investigating Deputy Dorflinger.

15.  Sheriff Mendeke directed Mr. Garcia not to look into the matter further

and to drop it.

16.    Later that day, Chief Deputy Brandon McCutchen came into Mr. Garcia's office and stated that he had a message from Sheriff Mendeke.

17.    According to Chief Deputy McCutchen, Sheriff Mendeke said that if Mr. Garcia cared about his job with the sheriff's department, he would not investigate Deputy Dorflinger.

18.    As Mr. Garcia began to explain Mr. Dorlfinger's violations of law, Mr. McCutchen cut him off, stating, "Do I make myself clear?"

19.    Throughout 2014 and 2015, Deputy Dorflinger's name came up several times regarding drug use and planting evidence.

20.    All of this information was passed on to the F.B.I. by Mr. Garcia.

21.    On February 20, 2015, Mr. Garcia witnessed Deputy Dorflinger mishandle evidence.  Specifically, Mr. Garcia saw Deputy Dorflinger in possession of an unsealed and unlabeled evidence bag containing methamphetamines.  Mr. Garcia instructed Deputy Dorflinger to secure and process the evidence as soon as he returned from the burglary call.

22.    Later, according to video surveillance, Deputy Dorflinger stole drug evidence from the sheriff's department evidence room.

23.    It is a violation of the penal code to steal drugs from the sheriff department's evidence room.

24.    After Mr. Garcia obtained the video of the theft, he reported the incident to Chief Deputy McCutchen and provided a copy of the video.

25. As before, Chief Deputy McCutchen told Mr. Garcia to drop the investigation into Deputy Dorflinger.

26. Because internal reporting of these violations was not resulting in any action, Mr. Garcia told Chief Deputy McCutchen that he would be turning over all of his evidence to the district attorney's office.

27. Shortly thereafter, Mr. Garcia turned the case over to District Attorney Daniel Kindred and the Assistant District Attorney Christina Busbee. The D.A. stated he would speak to Sheriff Mendeke about the case.

28. Generally, an investigator turns over a case to the D.A. after the investigation has been completed for prosecution.

29. In this case, Mr. Garcia was so concerned about police corruption and evidence tampering that he went outside of the sheriff's department and spoke to the D.A. and A.D.A. about Deputy Dorflinger's violations of law. Mr. Garcia spoke as a citizen because his job duties did not include investigations of co-workers, he went outside his internal command structure, and he asked that the D.A. not reveal that he made the report to Sheriff Mendeke.

30. At that time, Mr. Garcia also turned over evidence of Deputy Dorflinger's violations of law to the D.A. and A.D.A.

31. On or about March 10, 2015, District Attorney Kindred spoke to the Sheriff about Mr. Garcia's report of Deputy Dorflinger's unlawful conduct.

32. On March 11, 2015, the sheriff yelled at Mr. Garcia because he had gone

outside of his job responsibilities by reporting Deputy Dorflinger to the D.A. without talking to the Sheriff first.  Sheriff Mendeke claimed that he had not seen some of the evidence Mr. Garcia presented to the D.A.

33.   Mr. Garcia asked if Sheriff Mendeke had seen the video of Deputy Dorflinger stealing drugs.  Sheriff Mendeke stated that he did not see it.

34.   Chief Deputy McCutchen stated he had gotten rid of the video after watching it.

35.   On March 13, 2015, Sheriff Mendeke met with Mr. Garcia about one of the memorandums Mr. Garcia gave to the D.A. concerning Deputy Dorflinger's unlawful conduct.  Mr. Garcia recorded this meeting.

36.   During this meeting, Sheriff Mendeke yells at Mr. Garcia that "You went behind my back!" and "You fucked me over."  Sheriff Mendeke also stated, referring to the evidence mishandling allegations, that "[Mr. Garcia] didn't need to put all of that in there" and calls it "shit."

37.   Then Sheriff Mendeke stated, "There is a certain group of deputies here that I protect" and "you [Mr. Garcia] belong to me."

38.   Sheriff Mendeke stated that Mr. Garcia was alienating himself from Sheriff Mendeke's protection.

39.   Additionally, Sheriff Mendeke discussed his view of evidence handling procedures and the way he used to do it, including that he "used to have shit for months in his trunk."

40.   During the third week of April 2015, Mr. Garcia found his locked desk

drawer forced open.   After that, Mr. Garcia set up a game camera to monitor his desk.

41.  On April 22, 2015, Mr. Garcia entered his office at around 7:30 am.  At that time he found that the game  camera had been deliberately turned to face the wall.

42.  When Mr. Garcia viewed the photos, he saw Sgt. Gilbert Valdez, Chief Deputy McCutchen and Sheriff Mendeke walk into the Investigations office and begin looking at Mr. Garcia's desk.   The sheriff picked up a body camera on Mr. Garcia's desk while Sgt. Valdez and Chief McCutchen walked around the side of Mr. Garcia's desk.  Someone then turned the game camera around.

43.  The next day, on April 23, 2015, Sheriff Mendeke terminated Mr. Garcia.

44.  The termination occurred less than 60 days after Mr. Garcia reported Deputy Dorflinger to the D.A.  The termination occurred only 41 days after Sheriff Mendeke told Mr. Garcia that "You fucked me over," that he "owns" Mr. Garcia, and that Mr. Garcia's actions were alienating him form the Sheriff's protection.

45.  Since Mr. Garcia's termination, the F.B.I. has opened an investigation on Deputy Dorflinger.  The F.B.I. and the Texas Rangers have given Deputy Dorflinger a polygraph test.  Based on information and belief, the Federal Prosecutor will no longer accept testimony from Deputy Dorflinger in federal court and there will be a state court hearing concerning Deputy

Dorflinger's ability to testify in state court cases.  Additionally, due to Deputy Dorflinger's violations of law, any convictions based on his prior investigations are now suspect.

46. Despite all of that, Deputy Dorflinger still works for Sheriff Mendeke and Uvalde County.

47. That is because Sheriff Mendeke has a policy and practice of protecting and helping Deputy Dorflinger.  For example, in 2014, both Chief Deputy McCutchen and Sheriff Mendeke assisted Deputy Dorflinger in expunging a charge of Possession of a Controlled Substance from when Deputy Dorflinger had been arrested in Del Rio, Texas.  In 2012, Deputy Dorflinger was arrested by a state trooper in Uvalde for a DWI, but was later released.

48. Here, that sheriff's department policy resulted in terminating Mr. Garcia for going outside of the department and reporting violations of law to the D.A. and the F.B.I.

49. As a member of law enforcement, Sheriff Mendeke knew that terminating an employee for speaking out about violations of law violated Mr. Garcia's first amendment rights.

50. Furthermore, Sheriff Mendeke has the power to hire, fire, and make final personnel policy for employees of the sheriff's department.

51. Here, Sheriff Mendeke exercised that official power by terminating Mr. Garcia for speaking out about police corruption outside of the department.

52. On July 13, 2015, the Uvalde County Commissioners' Court ratified Sheriff Mendeke's decision to terminate Mr. Garcia for reporting violations of law by voting to take no action on Mr. Garcia's complaint.

53. No other internal grievance procedures exist for Mr. Garcia to appeal his termination decision.

54. Therefore, all conditions precedent to the bringing of this lawsuit have been satisfied and fulfilled.

V

FIRST CAUSE OF ACTION: FIRST AMENDMENT VIOLATIONS

55. Plaintiff incorporates paragraphs 1-54 as if restated herein.

56. Plaintiff engaged in protected speech as a citizen concerning a matter of public concern when he went outside of the sheriff's department and his job responsibilities to report violations of law by Deputy Dorflinger and police corruption to the district attorney.

57. Defendants were motivated by Plaintiff's speech to terminate him.

58. Sheriff Charles Mendeke is individually liable under 42 U.S.C. § 1983 because free speech is a clearly established constitutional right and which precludes qualified immunity.

59. Uvalde County is liable under 42 U.S.C. § 1983 because it officially adopted and promulgated the decision to terminate Mr. Garcia for engaging in protected speech. The County is also liable because the

decision to terminate Mr. Garcia was made by officials to whom the County had delegated policy-making authority.

60. Defendants violated the United States Constitution when it terminated Plaintiff for engaging in protected speech.

## VI
## SECOND CAUSE OF ACTION: TEXAS CONSTITUTIONAL VIOLATIONS

61. Plaintiff incorporates paragraphs 1-60 as if restated herein.

62. Plaintiff engaged in protected speech concerning a matter of public concern when he went outside of the sheriff's department and his job responsibilities to report violations of law by Deputy Dorflinger and police corruption to the district attorney.

63. Sheriff Charles Mendeke is individually liable because free speech is a clearly established constitutional right and which precludes qualified immunity.

64. Uvalde County is liable because it officially adopted and promulgated the decision to terminate Mr. Garcia for engaging in protected speech. The County is also liable because the decision to terminate Mr. Garcia was made by officials to whom the County had delegated policy-making authority.

65. Defendants violated article 1, section 8 of the Texas Constitution when it terminated Plaintiff for engaging in protected speech.

## VII
## THIRD CAUSE OF ACTION: TEXAS WHISTLEBLOWER ACT

66.  Paragraphs 1-54 are incorporated herein by reference as if set forth verbatim.

67.  Defendant violated the Texas Whistleblower Act when it terminated Plaintiff for reporting in good faith a violation of law to an appropriate law enforcement authority, which included the Uvalde County Sheriff, the F.B.I., and the Uvalde County District Attorney.

68.  Each of those departments and agencies are law enforcement authorities with the power to investigate or prosecute violations of criminal law.

69.  A violation of law was reported in good faith because the actions reported by Plaintiff would violate, among other things, the Texas Penal Code and the Federal Controlled Substances Act.

70.  Plaintiff knew at the time he reported the activities that the activity was unlawful.

71.  Plaintiff's belief was reasonable.

72.  Plaintiff suffered an adverse employment action when he was terminated from his job.

73.  Plaintiff's termination was caused by his report of a violation of law to an appropriate law enforcement authority.

74.  Plaintiff was terminated within 90 days of one of his reports of Defendant's unlawful activity,

75.   Under the Texas Whistleblower Act, it must be presumed that Mr. Garcia's report of a violation of law caused his termination.

76.   Because of the actions of the Defendant, Plaintiff suffered damages within the jurisdictional limits of this Court.

## VIII
## JURY DEMAND

77.   Plaintiff demands trial by jury.

## IX
## DAMAGES

78.   Plaintiff seeks all damages allowed under the law, including monetary damages and:

   (a)   injunctive relief;

   (b)   actual damages;

   (c)   court costs;

   (d)   reasonable attorney's fees;

   (e)   back pay, front pay, and other compensation for wages lost as a result of termination;

   (f)   emotional distress, mental anguish; and

   (g)   Plaintiff seeks pre- and post-judgment interest at the maximum rate allowed by law.

   WHEREFORE, premises considered, Plaintiff respectfully prays that Defendant be cited to appear and, that upon a trial on the merits, that all relief

requested be awarded to Plaintiff, and for such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,
ROB WILEY, P.C.

By: _/s/ Colin Walsh_
Robert J. Wiley
Texas Bar No. 24013750
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*
Colin Walsh
Texas Bar No. 24079538

LAW OFFICE OF ROB WILEY, P.C.
1011 San Jacinto Blvd., Ste. 401
Austin, Texas 78701
Telephone: (512) 271-5527
Facsimile: (512) 287-3084
cwalsh@robwiley.com
ATTORNEYS FOR PLAINTIFF